IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :

      v.                                    :          CRIMINAL NO. 24-376-06-JLS

ALBERT GROFF                      :

## GOVERNMENT'S CHANGE OF PLEA MEMORANDUM

### I.    BACKGROUND

Defendant Albert Groff is charged in a superseding indictment (the "indictment") with one count of conspiracy to commit wire fraud and 19 counts of wire fraud. The defendant has notified the government through his counsel that he wishes to enter guilty pleas to certain counts of the indictment.

### II.    APPLICABLE STATUTES AND ESSENTIAL ELEMENTS OF THE OFFENSES

#### A.    Wire Fraud Conspiracy (18 U.S.C. § 1349) – Count 1

To obtain a conviction for wire fraud conspiracy in violation of 18 U.S.C. § 1349, the government must prove the following elements beyond a reasonable doubt:

1. two or more persons agreed to commit wire fraud;

2. the defendants were parties to or members of that agreement; and

3. the defendants joined the agreement or conspiracy knowing of its objective to commit wire fraud and intending to join together with at least one other alleged conspirator to achieve the objective; that is, that each defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve a common goal or objective, to commit wire fraud.

*See* Third Circuit Model Criminal Jury Instruction, No. 6.18.371A; *United States v. Rankin*, 870 F.2d 109, 113 (3d Cir. 1989). Section 1349 does not require proof of an overt act. *See United States v. Obaygbona*, 556 Fed. App'x 161, 163-64, 2014 WL 764764 (3d Cir. 2014); *United*

*States v. Salahuddin*, 765 F.3d 329, 338 (3d Cir. 2014) (Hobbs Act conspiracy); *United States v. Fullmer*, 584 F.3d 132, 160 n.13 (3d Cir. 2009).

      **B.**      **Wire Fraud (18 U.S.C. § 1343) – Counts 10, 13, 14, 17, and 18**

To obtain a conviction for wire fraud in violation of 18 U.S.C. § 1343, the government must prove the following elements beyond a reasonable doubt:

1. the defendant's knowing and willing participation in a scheme or artifice to defraud,

2. with the specific intent to defraud, and

3. the use of interstate wire communications in furtherance of the scheme.

*United States v. Scarfo*, 41 F.4th 136, 198 (3d Cir. 2022) (quoting *United States v. Andrews*, 681 F.3d 509, 518 (3d Cir. 2012)); *see also* 3rd Circuit Model Criminal Jury Instructions, No. 6.18.1343 Wire Fraud – Elements of the Offense.

The wire fraud offenses are also charged under the aiding and abetting statute. To establish a violation of 18 U.S.C. § 2, Third Circuit precedent requires that the government establish two elements beyond a reasonable doubt: "(1) that the substantive crime has been committed; and (2) that the defendant charged with aiding and abetting knew of the commission of the substantive offense and acted with intent to facilitate it." *United States v. Huet*, 665 F.3d 588, 596 (3d Cir. 2012); *United States v. Petersen*, 622 F.3d 196, 208 (3d Cir. 2010); *see also* 3rd Circuit Model Criminal Jury Instructions, No. 7.02 Accomplice Liability: Aiding and Abetting.

## III.    **MAXIMUM PENALTIES**

The following statutory maximum sentences apply in this case: Count 1, conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, as enhanced by the SCAMS Act, 18 U.S.C. § 2326, 30 years' imprisonment, a five-year period of supervised release, a $250,000

- 2 -

fine, and a $100 special assessment; and on each of Counts 10, 13, 14, 17, and 18, as enhanced by the SCAMS Act, 18 U.S.C. § 2326, 30 years' imprisonment, a five-year period of supervised release, a $250,000 fine, and a $100 special assessment.

The total permissible statutory maximum sentence is a term of imprisonment of 180 years, a term of supervised release of five years, a fine of $1,500,000, and a special assessment of $600. Full restitution shall also be ordered, in an amount to be determined by the Court but which could be as much as $150,000,000. Forfeiture of all proceeds from the offenses also may be ordered.

## IV.    <u>FACTUAL BASIS FOR THE PLEA</u>

If this case were to proceed to trial, the government would prove the following facts, among others, through witness testimony and exhibits. This memorandum sets forth only the essential facts that would need to be proved to establish the elements of the offenses to which the defendant will be pleading guilty.

During the indictment period, that is, from January 2018 until early December 2022, defendant Alan Redmond operated a nationwide telemarketing fraud scheme from a call center near Reading, Pennsylvania. Through a group of companies that included defendants Bene Market LLC and Seguro Medico LLC, among other entities, and which did business under various trade names such as Quick Health, Q Health, Benefits Now, Express Benefits, and Your Benefits for You (collectively, the "Bene Market Group"), Redmond sold discount health and dental plans to tens of thousands of consumers through a series of false, misleading, and deceptive sales practices, essentially a bait-and-switch scheme in which the sales force, under Redmond's direction, systematically deceived consumers into purchasing limited benefit plans that provided little or no coverage by making it appear that the plans sold by the Bene

Market Group provided comprehensive or major medical health insurance, or equivalent coverage, when they did not.

The Bene Market Group paid lead generators for the transfer of live calls with consumers looking to purchase healthcare insurance. Once transferred over, the Bene Market Group salesforce falsely told consumers that it worked as an impartial third-party broker to search and compare products across the entire marketplace to find the best health insurance available at the lowest rate. The Bene Market Group claimed to be "the national enrollment center for health insurance" and claimed to "work with over 30 of the top A-rated insurance companies" to sell insurance from blue-chip carriers such as Aetna, Humana, Cigna, United Health Care, and Blue Cross Blue Shield. In reality, the Bene Market Group did not search the marketplace, did not work with the listed A-rated carriers, and during the indictment time period, did not even sell major medical insurance,[1] which is regulated by the Affordable Care Act (the "ACA"). Instead, the Bene Market Group peddled a variety of discount and limited products that were different from major medical insurance, and had lower and more restricted benefits than, major medical insurance.

---

[1] Major medical insurance, also known as comprehensive health insurance, was a type of health insurance that was designed to cover a majority percentage of the medical costs that an average American would pay during the year. Major medical insurance plans typically had a set amount, or deductible, which the patient was responsible for paying. After the deductible was met, major medical insurance typically paid a majority percentage of the remainder of the patient's medical bills, expressed as a percentage, e.g., 80/20 or 70/30. Major medical insurance was regulated by the Affordable Care Act ("ACA") and typically had a maximum out-of-pocket limit for the patient's share of the bills. Once the patient reached the maximum out-of-pocket limit, major medical insurance paid 100% of the patient's in-network care for the remainder of the year.

Many of the sales agents for the Bene Market Group were unlicensed, used fake names, and falsely told consumers that they were non-commissioned. Sales agents also provided consumers with false and misleading information about the plans being sold, including by falsely telling consumers that their specific medical conditions, procedures, providers, and medications were covered, when they were not. Sales agents also regularly concealed, omitted, and told half-truths about the material limitations of the products sold by the Bene Market Group. On the back end, many consumers were over-billed or double-billed by the Bene Market Group, and consumer complaints and refund requests were routinely ignored or delayed. Sales agents were not meaningfully disciplined for making misleading and deceptive sales pitches to consumers, even after being sanctioned by state regulators and insurance boards.

At the conclusion of the sales calls, the Bene Market Group sales staff typically played a verification recording or transferred consumers to the verification department, which reviewed various terms and conditions relating to the plans and products sold. The closers often prepared the consumers so that they would agree that they understood the terms and conditions during the verifications. For example, the sales force falsely told consumers that the verifications were outdated, that the verifications were generic to all products sold, that the verifications could be ignored, or that the verifications could be passed over by just pressing 1. In other instances, the Bene Market Group accelerated the speed of the verification recordings or simply skipped or shortcut the verification process altogether when making sales to consumers.

The products that the Bene Market Group sold during the charged period included the following, none of which were comprehensive or major medical insurance, and none of which were subject to regulation under the ACA: (i) fixed indemnity plans, which paid only a limited or fixed dollar amount per day or per medical service (the "cap"), regardless of the actual costs

incurred for care, leaving the patient responsible for paying all medical expenses above the fixed cap amount; (ii) short term medical plans, which were exempt from compliance with the ACA, and typically provided gap coverage for a limited time; and (iii) group health membership plans, including health care sharing ministries, which were often not insurance at all and generally focused on preventive services and did not cover or restricted or capped coverage for many services. The indictment refers to these three types of plans, along with the ancillary products bundled with these plans, collectively as "Limited Benefit Plans."

None of the Limited Benefit Plans sold by the Bene Market Group were major medical insurance, and all had lower and more restricted benefits than major medical or comprehensive insurance. In some instances, the Limited Benefit Plans sold by the defendants were not even insurance.

During the charged period, neither the ACA nor state insurance laws made it illegal to offer for sale any of these Limited Benefit Plans. What was illegal was to lie about the sales process and plans sold in order to convince consumers that the Limited Benefit Plans were comprehensive major medical insurance policies, mimicked major medical insurance, or provided coverage equivalent to major medical insurance at a lower cost. This is what the Bene Market Group did in hundreds of thousands of recorded telephone calls over the charged period. As a result of the fraud scheme, tens of thousands of consumers purchased Limited Benefit Plans from the Bene Market Group with the belief that they had acquired major medical or actual health insurance, but they were actually left without coverage for the majority of their medical, dental, and prescription costs. In some instances, consumers incurred substantial medical bills for which they had no coverage, and were left with medical debt in the tens and hundreds of thousands of dollars.

During the charged period, defendant Groff was the Bene Market Group's leading salesman and a sales manager. He was the highest-paid salesman; his salary, which was largely commission, ranged from $200,000 to $550,000 per year. Groff personally made extensive fraudulent misrepresentations to customers during recorded sales calls, as reflected in Counts 10, 13, 14, 17, and 18 of the indictment, and the corresponding overt acts in the Count One conspiracy. Consistent with Groff's status as by far the most productive salesman at the Bene Market Group, he was held out by management to sales staff as a model of how sales should be made, and Groff's recorded calls were frequently used to train new sales staff.

Groff was fully aware of the fraudulent sales tactics used to sell the Limited Benefit Plans, as he lied to consumers in recorded calls himself; helped train and oversee the sales staff; circulated misleading sales scripts; coached the sales staff on misleading sales tactics; and listened in on live calls made by sales staff. Groff also ignored issues with his own insurance license and sales that arose on a regular basis with state regulators due to his misrepresentations to consumers. Groff was also aware that the Limited Benefit Plans were "bundled" with other ancillary products in order to make it appear that they constituted comprehensive or major medical insurance. Emails, text messages, recordings, and witness testimony, as well as Groff's own admissions, further corroborate Groff's knowledge of and involvement in the Bene Market Group's deceptive business practices.

Defendant Groff was interviewed on December 2, 2022, during execution of a search warrant at the Bene Market Group's call center. Groff admitted that the company did not sell major medical insurance, selling only indemnity plans, and admitted further that the company could find better policies to sell. After his arrest on May 28, 2025, Groff agreed to a custodial

interview, during which Groff reiterated that the company only sold hospital indemnity and short-term plans, and he admitted that some consumers were double-billed.

Through his counsel, Groff has indicated that he will enter pleas of guilty to Counts 1, 10, 13, 14, 17, and 18. As to Counts 10, 13, 14, 17, and 18 (the substantive wire fraud counts), at a trial the government would introduce the recorded conversations between the defendant and consumers that are listed below. In each recorded call, Groff, who was located in the Eastern District of Pennsylvania, fraudulently solicited the consumer, located in another state, to purchase a Limited Benefit Plan with numerous misrepresentations and half-truths:

**Count 10 – August 18, 2021**: Groff falsely told the consumer, P.L., that he would be "covered day one dollar one without having to spend any of your own money" and "you won't be able to buy better insurance." When the consumer, P.L., questioned Groff about the verification disclaimers, Groff falsely said that "the out-of-network [limitation] is just on there [the verification] because it's a technicality" and that he (Groff) would just "send you straight through so you don't have to go through this dumb recording."

**Count 13 – November 17, 2021**: Groff falsely told E.T., a consumer looking for insurance, that his company worked with 30 of the top A-rated insurance companies and sold "Aetna, Humana, Cigna, United Healthcare, Blue Cross Blue Shield." Groff also falsely told the consumer that with the Limited Benefit Plan offered, the "only thing he would pay on a hospitalization is a $350 dollars co-pay and then the insurance would pay 100% after that. It's literally as good as it gets. Like if he had a heart attack got two stents put in his heart and ended up having $80,000 bill once he pays $350 the insurance is paying everything after that, it's literally as good as it gets . . . it's a privatized insurance that meets all the credentials of Obamacare . . . the only thing you're gonna find comparable [in price similar to this] is like

hospital discount plans, which aren't real health care. They're gonna be like glorified accident plans. That's the only thing you'll be able to find" at a similar price point.

**Count 14 – December 11, 2021**: Groff falsely represented to a consumer, L.R., that he was a salaried employee and non-commissioned: "I don't get paid a commission, alright," and falsely stated that the Limited Benefit Plan being pitched was the "same plan I use" and that he (Groff) used the plan to cover an $80,000 cornea transplant while only paying $350. Groff also falsely claimed that the "government had reviewed" the Limited Benefit Plan which would "cover pre-existing conditions, it covers hospital benefits, there's a prescription plan, this meets all the criteria" and that "there's no cap on the coverage either" because "you're getting a comprehensive major medical health insurance," "which is getting accepted everywhere," and "you're going to have no issues with this insurance."

**Count 17 – January 24, 2022**: Groff falsely represented to a consumer, A.C., as to a Limited Benefit Plan, that the Plan was a "full-fledged, comprehensive, major medical" plan and that if the consumer was "admitted in [to the hospital] the most you're paying is $350, she has a heart-attack, stroke, whatever the case may be, $350" and that no more than $350 will ever come out of A.C.'s pocket, even if placed on a ventilator for ten years. Groff also falsely claimed that he personally had used the same Limited Benefit Plan to cover a $120,000 cornea transplant that only cost him $350. Finally, Groff falsely instructed the consumer that she "can ignore" the verification recording relating to pre-existing conditions and to just let the verification "go in one ear and out the other."

**Count 18 – February 2, 2022**: Groff described the Limited Benefit Plan sold to the spouse of a consumer, D.P., earlier that week as "a comprehensive major medical" plan that "meets all the criteria of the Affordable Care Act so this is health insurance, this is nothing of the

- 9 -

discount or any of that nonsense." When the consumer D.P. continued to express concern and question what the plan covered, Groff falsely insisted "what that lady [at the doctor's office] told you [about your plan's limited benefits] was incorrect. She is wrong. You have an extremely comprehensive plan. If you were to have a heart attack and be in the hospital for a week and have a $200,000 bill, you would pay $350 on it." Groff also falsely stated that the plan "covers pre-existing conditions, it gives you all the things that you and I would consider ordinary and customary in an insurance policy" and "once you meet your $350 [co-pay], the hospital pays 100% after that."

## V.    PLEA AGREEMENT

The parties have executed a plea agreement, which will be presented to the Court during a hearing regarding entry of the guilty plea, in which the defendant agreed to plead guilty to wire fraud conspiracy (Count 1), and five counts of wire fraud (Counts 10, 13, 14, 17, and 18) as charged in the superseding indictment. The plea agreement contains joint stipulations to a loss amount range and enhancements, along with an appellate waiver. The government also agreed to dismiss the remaining counts of the indictment as to this defendant at the time of sentencing. The agreement includes a supplement to be filed under seal.

The guilty plea hearing is scheduled for December 16, 2025, at 2:00 p.m.

## VI.    <u>CONCLUSION</u>

The government requests that the Court conduct a hearing under Federal Rule of

Criminal Procedure 11 and if warranted then accept the defendant's plea of guilty.

Respectfully submitted,

DAVID METCALF
United States Attorney


 */s Mary E. Crawley*
MARY E. CRAWLEY
Assistant United States Attorney


 */s Samuel S. Dalke*
SAMUEL S. DALKE
Assistant United States Attorney

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this Change of Plea Memorandum has been served by email on:

John J. Griffin, Esq.
jjg@philadelphialawyerservices.com

*/s Mary E. Crawley*
MARY E. CRAWLEY
Assistant United States Attorney

DATED:  December 10, 2025